IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
|  | * |  |
| AMADOU DIALLO, | * |  |
| Plaintiff, | * |  |
| v. | * | Civ. No. 8:24-cv-00421-PX |
| MARKWAYNE MULLIN, et al., | * |  |
| Defendants. | * |  |

***

**<u>MEMORANDUM OPINION</u>**

Pending in this employment discrimination case is the motion to dismiss, or alternatively for summary judgment filed by the Secretary of the United States Department of Homeland Security Markwayne Mullin on behalf of the Department of Homeland Security ("DHS") (collectively "the Government").[1]  ECF No. 23.  The issues are fully briefed, and the Court finds no hearing necessary.  *See* D. Md. Loc. R. 105.6.  For the reasons stated below, the motion is granted.

**I.    Factual Background**

The Court accepts the complaint facts as true and most favorably to pro see Plaintiff Amadou Diallo ("Diallo").  *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).  Diallo is a Senegalese man who adheres to the Islamic Faith.  ECF No. 22 ¶ 7.  From June 2013 until February 2024, Diallo worked for the United States Citizenship & Immigration Services ("USCIS")'s Social Media Division.  ECF No. 22 ¶¶ 8, 17, & 40.  This suit is the culmination of

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), former DHS Secretary, Kristi Noem, is replaced with the current Secretary, Markwayne Mullin.

three administrative actions that Diallo had pursued before DHS' Equal Employment Opportunity ("EEO") Office. *See* HS-CIS-00837-2019 (the "2019 EEO Action"), HS-CIS 1890-2022 (the "2022 EEO Action"), and HS-CIS-20167-2023 (the "2023 EEO Action"). The factual and procedural backgrounds for each, as far as the Court can discern, are discussed below.

### A. The 2019 EEO Action

In May 2018, Diallo attended a meeting with his Team Lead, Mathew J. Breznai ("Breznai") during which Breznai asked Diallo whether he was a "terrorist" and if he was "on the side of the terrorists or the United States." ECF No. 22 ¶ 20. Diallo reported the incident to management but initially received no response. *Id.* On June 4, 2018, Diallo reported the incident to Branch Chief Bradley Harp ("Harp"), and Harp "organized a meeting" with Diallo at which Breznai ultimately "apologized for his behavior." *Id.* At the conclusion of the meeting, Harp expressed to Diallo that because "he used to arrest Chinese operatives" when he worked for the FBI, he "understood Mr. Breznai's reactions." *Id.* Diallo felt "overwhelming distress" over Harp's comment. *Id.*

In October 2018, Diallo applied for the position of Immigration Officer Team Lead ("IO Team Lead") within the Social Media Division. ECF No. 22 ¶ 17. Diallo had previously performed as "acting supervisor and Team lead." *Id.* On December 19, 2018, Diallo interviewed for the position with a panel that included Division Chief Vogt and Supervisor Cynthia Burke ("Burke"). Burke was the "only person . . . with previous knowledge of" Diallo. *Id.* At the outset, Burke asked Diallo if he "had the English capabilities to review a Social Media Assessment." *Id.* Diallo had previously scored above a passing grade in the Wonderlic writing assessment, which is used to measure language proficiency. *Id.*

On January 11, 2019, Diallo learned that he had not been selected for the IO Team Lead.

2

ECF No. 22 ¶ 17.  Five days later, at Diallo's request, Diallo met with Division Chief Kevin Quinn ("Quinn") to express his concern that the interview process had been "tainted" by "Burke's opening question regarding his English abilities."  *Id*. ¶ 21.  In response, Quinn informed Diallo that his resume had received low scores, and the interview had been offered to Diallo solely because the interview team knew him.  *Id*.  Quinn then "defaced" Diallo's resume and suggested that he "should find a job elsewhere if he didn't like working for the division."  *Id*.  Quinn also directed Diallo to raise his issues to his immediate supervisor and not "bring his problems" to Quinn.  *Id*.

The next day, Quinn announced that for Social Media Division employees, overtime was "no longer necessary because the backlog had been eliminated."  ECF No. 22. ¶ 22.  Diallo had also been working overtime for the Fraud Division.  *Id*.  However, at an unspecified time, Vogt cancelled Diallo's overtime.  *Id*.

On April 1, 2019, Diallo met with Burke for his mid-cycle review.  ECF No. 22 ¶ 35. During the review, Burke issued Diallo a formal letter of reprimand for failure to follow orders and for inappropriate communication with a supervisor.  *Id*.  Burke also noted performance issues with Diallo in that he had failed to review eight social media accounts the prior month and had switched his teleworking days without first obtaining permission.  *Id*.

On May 15, 2019, Diallo filed the 2019 EEO Action for national origin discrimination and reprisal based on his non-selection for the IO Team Lead.  ECF No. 22 ¶ 43; ECF No. 23-5 at 3.[2] After the EEO office for USCIS rejected the complaint, Diallo requested a hearing before an administrative judge.  ECF No. 23-5 at 3.  On June 8, 2023, an administrative judge denied the

---

[2] The Court considers appended agency documents to ascertain whether the plaintiff has exhausted administrative remedies.  *See Cheng v. U.S. Bureau of Lab. Stat.*, No. CV 21-03282-BAH, 2024 WL 1743409, at *5 (D. Md. Apr. 22, 2024).

claims in a written decision. *Id.* at 3. Thereafter, Diallo appealed the decision to the EEOC which was affirmed without a hearing. ECF No. 23-6.

### B. The 2022 EEO Action

On November 17, 2021, Diallo's direct supervisor, Walid Rawash ("Rawash"), requested a meeting to discuss Diallo's case-tracking methods. ECF No. 22 ¶ 24. During the meeting, Diallo showed Rawash "another way of tracking cases" that Diallo thought "was easier and faster" than the method Rawash used. *Id.* In response, Rawash told Diallo that he "was not qualified for the job." *Id.* According to Diallo, Rawash's comment was related to Diallo's process for sending "derivatives" for review that Diallo had "inherited" from a prior team lead. *Id.* Diallo reported this interaction to Branch Chief Danyale Warren ("Warren"). *Id.*

A few weeks later, on December 1, 2021, Rawash called another meeting with Diallo "to talk about feedback." ECF No. 22 ¶ 25. Diallo expected that Rawash would "disrespect[]" him, so Diallo asked Rawash for permission to record the meeting at the same time that he started the recording. *Id.* Rawash declined and Diallo stopped recording. *Id.* Diallo felt "disrespected again" during the meeting and emailed "upper management regarding the abuses." *Id.*

On January 11, 2022, Diallo was instructed not to escalate "reports of abuse to upper management" and instead to forward them to Rawash as he was Diallo's direct supervisor. ECF No. 22 ¶ 26. The next day, while in a team meeting, Diallo objected to this directive and insisted he would continue to take his complaints to upper management. *Id.* ¶ 35. Warren, who was not at the meeting, learned of Diallo's opposition and issued him a letter of counseling in which Warren described Diallo as having "used an inappropriate tone, exhibited levels of frustration and demonstrated discourteous behavior." *Id.*

Two months later, in March 2022, Rawash mistakenly sent an email to Diallo that included

weekly production data for the team.  ECF No. 22 ¶ 27.  Believing the email contained "falsified" production numbers that made Diallo "look bad," Diallo confronted Rawash about the email.  *Id*. On March 23, 2022, Diallo reported the purported "false" production numbers to upper management and received "a letter of reprimand . . . for failure to fully comply" with the directive not to bring complaints to upper management.  *Id*. ¶ 35.  That same month, Rawash and Warren also directed Diallo "to report to work in the office," because Diallo "had failed to follow [an] order" and "needed to be under close" supervision.  *Id*. ¶ 29.

The next month, on April 5, 2022, Diallo requested access to a "prayer room."  ECF No. 22 ¶ 18.  Rawash informed Diallo that he could use the eReserve website to reserve a private space. *Id*.  On the same day, Diallo responded that management needed to provide "the accommodation as requested under Title VII."  *Id*.  On April 22, 2022, Rawash "granted" the accommodation and informed Diallo that management was not responsible for "reserv[ing] [a] space on [Diallo's] behalf for private religious observances."  *Id*.

Later in April, Diallo asked Rawash to change to his work schedule for religious reasons, evidently to a four-day, ten-hour a day work week.  ECF No. 22 ¶ 18.  Hearing nothing, Diallo followed with another request.  *Id*.  On May 2, 2022, Diallo learned that because the Division "does not have a 4/10 schedule," both Rawash and the "Chief of Staff" suggested that Diallo use personal leave should he need to take a day off.  *Id*.

In July 2022, Diallo was placed on "absent without leave" status even though he "submitted a medical certificate."  ECF No. 22 ¶ 28.  Diallo had requested vacation in late June but then became sick on July 1, requiring leave through July 15.  *Id*.  The Complaint does not make any further allegations regarding these events.

On August 2, 2022, Diallo received a Notice of Proposed Suspension "for allegedly

unprofessional conduct and a failure to comply with instructions" directing that he not escalate complaints to upper management.  ECF No. 22 ¶ 35.  Later, on August 15, 2022, Division Chief "Brown" counseled Diallo and suspended him for seven days, effective October 4, 2022.  *Id*.  On the same day, Diallo was instructed to submit a reasonable accommodation and medical inquiry form in relation to his request to "telework due to high levels of Covid."  *Id*. ¶ 30.  Diallo's doctor refused to sign the form as Diallo was "not disabled."  *Id*.  Instead, Diallo submitted a statement from his doctor confirming that Diallo had "an underlined [sic] case," presumably of Covid.  *Id*. The Amended Complaint does not allege whether the request was granted.  According to Diallo, "he was the only person who was required to come into the office during high level [sic] of Covid." *Id*.

On October 26, 2022, Diallo received "an unacceptable rating" on his fiscal year 2022 performance review.  ECF No. 22 ¶ 37.  On November 18, 2022, Diallo was denied a grade increase which Diallo attributes to Rawash's negative reviews and false allegations regarding inflated production numbers.  *Id*. ¶ 31.

Next, on January 9, 2023, Diallo received a fourteen-day suspension for failing to follow leave-request procedures pertaining to his leave from July 1 to 15, 2022.  ECF No. 22 ¶ 35. According to Diallo, he submitted a request for three weeks of leave but believes Rawash had reduced the number of weeks on the leave request to one.  *Id*.  The final decision resulted in a ten-day suspension effective April 6, 2023, for "falsifying his time and attendance."  *Id*.

From this, Diallo filed the 2022 EEO Action on July 18, 2022, alleging religious discrimination, failure to accommodate, hostile work environment, and reprisal.  ECF No. 22 ¶ 43. ECF No. 23-14.  While the matter was pending, Diallo filed this suit.  Accordingly, the Complaint was dismissed in favor of this litigation.  ECF No. 23-17.

### C.  The 2023 EEO Action

Around the time Diallo received his 2023 midyear review, Rawash expressed that he would continue to rate Diallo as "unacceptable" so long as he remained Diallo's supervisor.  ECF No. 22 ¶ 32.  Rawash also told Diallo during the review itself that Diallo did not know "how to use the systems," and that Diallo's "customer service was unacceptable" based on survey feedback.  *Id*. Thereafter, Diallo emailed Rawash about his performance, but Rawash "refused to respond with specific information" to explain Diallo's "poor midyear review."  *Id*.

Rawash next "reassigned" Diallo's work to other employees, ECF No. 22 ¶ 33, and "insulted" Diallo "many times," including in front of others.  *Id.* ¶ 33–34.  Diallo, for example, took umbrage at an email in which Rawash told Diallo that his response to disciplinary action had been an "inappropriate, unwelcome, rude, impolite, discourteous, disrespectful, unprofessional, and obscene manner of communication."  *Id*.

On July 28, 2023, the agency issued Diallo "a notice of proposed suspension" for having forwarded to his personal email sensitive agency information.  ECF No. 22 ¶ 35.[3]  On October 31, 2023, Diallo received an "unacceptable rating" on his 2023 fiscal year performance review.  On November 7, Rawash placed Diallo on a performance improvement plan.  *Id*. ¶ 37.  Two weeks later, "management" issued Diallo a notice of proposed removal and began reviewing his work every Saturday and Sunday.  *Id*.  On December 15, 2023, the office of Security and Integrity, Personnel Security Division, revoked Diallo's access to classified national security information, and on February 5, 2024, Diallo was fired.[4]

---

[3] The suspension was rescinded on November 14, 2023.  ECF No. 22 ¶ 35.

[4] Evidently the agency also opened several investigations into Diallo for emailing sensitive information to himself (INV-FY-2022-848); "illegally" recording his supervisor (INV-FY-2023-798); and for creating a hostile work environment (INV-FY-2023-1417).  ECF No. 22 ¶ 35.

Diallo filed the 2023 EEO Action on November 8, 2023, and thereafter amended it to include removal from federal service on February 5, 2024.  ECF No. 22 ¶ 43; ECF No. 23-20.  The matter was dismissed when Diallo filed this suit.  ECF No. 23-21.

## II.    Procedural History

Diallo initiated this action on February 13, 2024.  ECF No. 1.  The Court granted the Government's motion to dismiss the initial complaint on March 5, 2025, but, considering Diallo's pro se status, gave him one chance to cure the pleading defects in an amended complaint.  ECF No. 19 at 15.  Thereafter, Diallo filed a timely Amended Complaint, alleging an array of claims, but only four merit extended discussion, s*ee infra* n.5, namely; national origin and religious discrimination (Count I); harassment (Count II); retaliation (Count III); and wrongful termination (Count V), all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended.  ECF No. 22 ¶¶ 47–57, 61.  The Court considers the sufficiency of each count separately.

## III.    Standard of Review

The Government seeks dismissal of the Amended Complaint, or alternatively for summary judgment to be granted in its favor.  ECF No. 23.  The Court construes the motion as one to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6).  A motion to dismiss tests the sufficiency of the Complaint.  *See Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  The Court must accept "the well-pled allegations of the complaint as true" and most favorably to the nonmovant.  *Ibarra*, 120 F.3d at 474.  To survive a motion to dismiss, a complaint's factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (citations omitted).  The Court, however, need not credit naked legal conclusions

devoid of factual support.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

Because Diallo proceeds pro se, the Court gives his pleading an especially charitable reading to allow the development of all potentially viable claims.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).  But "even a pro se complaint must be dismissed if it does not allege a 'plausible claim for relief.'"  *Forquer v. Schlee*, Civ. No. RDB-12-969, 2012 WL 6087491, at \*3 (D. Md. Dec. 4, 2012) (quoting *Iqbal*, 556 U.S. at 679).  Ultimately, a complaint must "'permit the court to infer more than the mere possibility of misconduct' based upon 'its judicial experience and common sense.'"  *Coleman v. Md. Ct. App.*, 626 F.3d 187, 190 (4th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679) (citation omitted).

The Court may consider "documents attached to the complaint, 'as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic.'"  *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019) (quoting *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).  A document is "integral" when "its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'"  *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (quoting *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D.Va. 2007)) (emphasis omitted).

With this standard in mind, the Court considers each Title VII claim in turn.[5]

---

[5] The remaining claims are not legally cognizable or are too threadbare to proceed, even when giving the Amended Complaint an especially generous reading.  Counts IV ("Title VII – Tampering with Evidence"), VII ("Failure to Timely Process EEO Complaint"), and VIII ("Violation of Ethics Laws – Conflict of Interest") do not state causes of action and are dismissed.  *See* ECF No. 22 at 23–24.  Count V (wrongful termination) is redundant of the Title VII retaliation and discrimination claims, and thus, cannot proceed alongside the alleged statutory causes of action. *Carson v. Giant Food, Inc.*, 187 F. Supp. 2d 462, 483 (D. Md. 2002), *aff'd sub nom. Skipper v. Giant Food Inc.*, 68 F. App'x 393 (4th Cir. 2003) (common law wrongful termination alleging discrimination is "generally precluded because federal and Maryland anti-discrimination laws create a civil remedy to vindicate discrimination in employment settings.").  Lastly, Count VI, a violation of the "Whistleblower Protection Act," merely avers that Diallo had complained about employees "retiring with multiple million dollars [sic] contracts" and that it "appears that Defendant failed to protect Plaintiff."  ECF No. 22 ¶ 42.  Even though an employee enjoys protection when reporting an employment-related violation of "law, rule, or regulation," 5 U.S.C. § 2302(b)(8)(A)(i)), Diallo's claim amounts to no more than a naked legal conclusion couched as fact.  *See Ashcroft,* 556 U.S. at 686.  Accordingly, Counts IV, V, VI, VII, and VIII are summarily dismissed.

## IV.    Discussion

### A.  National Origin and Religious Discrimination (Count I)

As best the Court can tell, Diallo avers that he suffered national origin discrimination arising from his 2019 non-selection as the IO Team Lead, and religious discrimination in connection with his request for a prayer room and flexible work schedule.  ECF No. 22 at ¶¶ 17–19.  Title VII renders it unlawful for an employer to discriminate against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Absent direct evidence of discrimination, the Court applies the burden shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Under *McDonnell Douglas*, a plaintiff makes the prima facie case if facts show: (1) the plaintiff belonged to a protected class; (2) he performed his job satisfactorily; (3) he suffered an adverse employment action; and (4) similarly situated employees who were not a member of his protected class received more favorable treatment.  *See White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004).  If the plaintiff makes that prima facie showing, the burden shifts to the employer to assert a legitimate, nondiscriminatory reason for its conduct, *McDonnell Douglas Corp.*, 411 U.S. at 802, and then the burden returns to the plaintiff to show that the stated rationale is a pretext for discrimination.  *See Foster v. Summer Vill. Cmty. Ass'n, Inc.*, 520 F. Supp. 3d 734, 742 (D. Md. 2021) (citing *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852 (4th Cir. 2001)).  Although at the pleading stage the plaintiff need not assert facts supporting every element of the prima facie case, some facts must allow the inference that he was treated adversely on account of a protected

characteristic.  *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002).  *See also McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015).

Turning first to the non-selection claim, Diallo, a Senegalese American, is a member of a protected class.  He also suffered an adverse action in his non-selection.  But no facts make plausible that he did not get the job because of his national origin.  At best, the Amended Complaint avers that Burke had commented on his English proficiency during the interview.  ECF No. 22 ¶ 17.  But this alone is not sufficient to give rise to an inference of discrimination.  As Diallo well knows, "language [proficiency] and national origin are not interchangeable."  *Diallo v. Noem*, No. 8:24-CV-00421-PX, 2025 WL 712933, at *6 (D. Md. Mar. 5, 2025) (quoting *Napreljac v. John Q. Hammons Hotels, Inc.*, 461 F.Supp.2d 981, 1029 (S.D. Iowa 2006), *aff'd*, 505 F.3d 800 (8th Cir.2007)); *see also Hanoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1048 (8th Cir. 2003) ("criticizing a foreign employee's facility with the English language [does not] constitute[ ] discrimination against a particular race or national origin").  Accordingly, just as with the original complaint, a single reference to Diallo's difficulty with English does not make plausible the claim.

Alternatively, even if Diallo made the prima facie showing, no facts make plausible that the stated reason for his non selection—low scores on his resume—was a pretext for discrimination.  As the Amended Complaint makes plain, the selection team did not believe Diallo was qualified for the job and, in fact, gave him the interview simply because the interviewers knew him.  ECF No. 22 ¶ 21 (Diallo "would not have made the interview list otherwise.").  In short, no facts show that Diallo's non-selection was because of his national origin.  The claim must be dismissed.

As for religious discrimination, Diallo contends that he was denied a reasonable accommodation for a suitable prayer space and a "4/10 work schedule."  ECF No. 22 ¶¶ 18 & 50.

Title VII makes it unlawful for an employer to discriminate against an individual because of his religion.  42 U.S.C. § 2000e-2(a).  This includes denial of reasonable accommodations of an employee's religious observance or practices.  42 U.S.C. § 2000e(j).  *See EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 141 (4th Cir. 2017).  To survive challenge, a plaintiff must first make a prima facie showing that "(1) he . . . has a bona fide religious belief that conflicts with an employment requirement; (2) he [ ] informed the employer of this belief; [and] (3) he [ ] was disciplined for failure to comply with the conflicting employment requirement."  *E.E.O.C. v. Firestone Fibers & Textiles Co.,* 515 F.3d 307, 312 (4th Cir. 2008) (citing *Chalmers v. Tulon Co. of Richmond,* 101 F.3d 1012, 1019 (4th Cir.1996)).  Like the burden shifting scheme in *McDonnell Douglas*, "[i]f the employee establishes a prima facie case, the burden then shifts to the employer to show that it could not [reasonably] accommodate the plaintiff's religious needs without undue hardship."  *Id.*; *see also* 42 U.S.C. § 2000e(j).  To satisfy its burden, the employer must demonstrate *either* (1) that it provided the plaintiff with a reasonable accommodation for his or her religious observances *or* (2) that such accommodation was not provided because it would have caused an "undue hardship." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 67 (1986) (citation omitted).

As to the prayer space, when viewing the Amended Complaint facts most favorably to Diallo, he had been granted reasonable accommodation. ECF No. 22 ¶ 18 (on April 22, 2022, Rawash "granted" Diallo's accommodation.).  All he needed to do was reserve a private meeting room at a time convenient to him.  *Id.* ¶ 18.  Moreover, to the extent Diallo believes the Government was somehow obligated to do more, he is wrong.  The test is a "reasonable" accommodation, not the employee's most preferred method of accommodation.  *See Firestone Fibers & Textiles Co.*, 515 F.3d at 314 (citing *Philbrook*, 479 U.S. at 69) ("We accordingly hold that an employer has met its obligation under [§ 2000e(j)] when it demonstrates that it has offered a reasonable

12

accommodation to the employee.").

As for the requested modification to Diallo's work schedule, Diallo does not allege any facts as to why his particular religious practices required that he not work one weekday every week. Further, the agency allowed Diallo to use "annual leave or compensatory time as religious leave." ECF No. 22 ¶ 18. *See* 29 C.F.R. § 1605.2(d)(1)(ii) (2007) (highlights the use of "flexible work schedules" such as "floating or optional holidays," as "[o]ne means of providing reasonable accommodation."); *see also Firestone Fibers & Textiles Co.,* 515 F.3d at 316 (finding an employer had reasonably accommodated an employee's request for a modified work schedule by allowing the employee to use floating days, unpaid leave, and shift changes). Accordingly, no facts make plausible that the requested work schedule was necessary to reasonably accommodate Diallo's religious practices, as opposed to the other reasonable accommodations offered. Thus, the claim will not proceed.

Because neither liability theory for Count I survives challenge, the claim is dismissed.

### B. Hostile Work Environment (Count II)

The Amended Complaint next avers that Diallo suffered a hostile work environment based on Breznai's "terrorist" comment; Burke's question about his English proficiency; the cancellation of his overtime; his meetings with Rawash about case tracking; admonitions not to involve "upper management" in his complaints; denial of vacation and medical leave; and other employment-related negative reviews and reassignments. ECF No. 22 ¶¶ 20–33. To make plausible a hostile work environment claim, a plaintiff must aver some facts that show he experienced (1) unwelcome conduct, (2) on account of his race [or national origin], (3) that was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive work environment, and (4) the conduct is imputable to the employer. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183–84

13

(4th Cir. 2001) (citation omitted).  Importantly, the alleged course of conduct must be "objectively 'severe or pervasive,'" when considering the totality of the circumstances.  *Evans v. Int'l Paper Co.*, 936 F.3d 183, 192 (4th Cir. 2019) (quoting *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)).  This includes the "frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the employee's work performance."  *Sunbelt Rentals*, 521 F.3d at 315 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

When viewing the Amended Complaint facts most favorably to Diallo, the claim fails on two fronts.  First, apart from Breznai's "terrorist" comment, no facts make plausible that the alleged adverse action had been remotely about his Senegalese heritage.  The litany of interactions instead seems focused on Diallo's poor work performance or refusal to follow directives.  Second, Breznai's "terrorist" comment, even in combination with Burke's query about Diallo's English proficiency, is simply not severe enough to alter the conditions of his employment.  ECF No. 22 ¶ 20.  Indeed, Breznai apologized at the direction of management and without further incident.  *Cf. Spriggs,* 242 F.3d at 185 (explaining that the n-word is a "pure anathema to African Americans" such that "no single act can more quickly alter the conditions of employment.").  Accordingly, the Court grants Defendants' motion as to Count II.

### C.  Title VII Retaliation (Count III)

Next, as to the retaliation claim, the Complaint must make plausible that: (1) the plaintiff engaged in a protected activity; (2) the employer took a materially adverse action against the plaintiff; and (3) a causal relationship exists between the two.  *Perkins v. Int'l Paper Co.,* 936 F.3d 196, 213 (4th Cir. 2019) (citation omitted).  A sufficiently "adverse" action for retaliation is one that "dissuades a reasonable worker from making or supporting a charge of discrimination."

14

*Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006) (internal quotation marks and citation omitted).  Causation may be inferred when the adverse action follows close in time to when the employer first becomes aware of the protected activity.  *See Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 126 (4th Cir. 2021).  By contrast, "a lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two."  *Roberts,* 998 F.3d at 126 (affirming grant of summary judgment in employer's favor for lack of causal connection where plaintiff was terminated three months after last report of harassment).  *See also Allen v. Rumsfeld*, 273 F. Supp. 2d 695, 708 (D. Md. 2003).

The Government does not dispute that Diallo's EEO activity is protected under Title VII. Nor does it meaningfully contest that Diallo's reprimands, suspensions, and ultimate termination are sufficiently adverse actions.  Instead, the Government principally contends that nothing makes plausible the causal connection between the two.  ECF No. 23-1 at 26–28.  The Court agrees.

The Amended Complaint recites a litany of adverse actions alongside an equally long list of protected activity.  But it makes no effort to connect any of the protected activity to some subsequent adverse action taken by a person who knew about the protected activity.  *See Gatebe v. Nelson*, No. 22-2127, 2024 WL 937079 at *3 (4th Cir. Mar. 5, 2024) (finding a plaintiff must show the relevant decisionmaker was aware of the plaintiff's protected activity at the time the alleged retaliation occurred.).  The Amended Complaint must make plausible a *causal* connection between an adverse action and the protected activity to allow for the inference that an employee had been punished for seeking Title VII protection.  The Amended Complaint, however, merely avers the coexistence of adverse employment actions and a series of EEO complaints.  This will not suffice.

Perhaps the Amended Complaint comes closest when it points to negative performance reviews issued on October 22, 2019, October 26, 2022, and October 31, 2023, as "retaliatory" and "based on [Diallo's] previous protected acts and whistleblower activities." ECF No. 22 ¶¶ 37–38. However, no facts make plausible a connection between those episodes and any particularly protected conduct. For example, the 2019 performance review had been issued five months after Diallo pursued the 2019 EEO Action. Without more, this lapse is simply too long to infer retaliatory animus. *See Roberts.*, 998 F.3d at 127. *See also Horne v. Reznick Fedder & Silverman*, 154 F. App' x 361, 364 (4th Cir. 2005) ("[A] lapse of two months between the protected activity and the adverse action is 'sufficiently long so as to weaken significantly the inference of causation.'") (citation omitted).

Similarly, Diallo initiated the 2022 EEO Action on July 18, 2022. ECF No. 23-1 at 12–13. The most proximate alleged adverse action—the October 26, 2022 "unacceptable" performance rating—occurred over three months later, and no other facts connect his EEO complaint to the poor review. *See Roberts,* 998 F.3d at 127. Nor does the Amended Complaint connect any of Diallo's subsequent amendments of the 2022 EEO Action with precipitous adverse action. Without more, the Court cannot plausibly infer any connection between the two.

Last, as to the 2023 EEO Action, Diallo filed the claim on November 8, 2023. ECF No. 22 ¶ 43. But the October 31, 2023, negative performance review *predated* the claim, so it could not have been in response to the EEO complaint. ECF No. 22 ¶ 37; *Roberts,* 998 F.3d at 127. Diallo also broadly avers that his February 2024 termination was "retaliatory in nature," ECF No. 22 ¶ 40, but this action also is too remotely temporal the 2023 EEO Action. Because no other facts allow the plausible inference that Diallo was fired because of his EEO activity, and for no other reason, the claim fails. *Cf.* ECF No. 22 ¶ 35 (listing investigations conducted against Diallo for

16

emailing sensitive work information to his personal email, "illegally" recording his supervisor, "[w]orkplace violence [p]revention," and creating a hostile work environment.).

## V.      Dismissal without or without Prejudice

Although the Court retains wide discretion to dismiss a complaint with or without prejudice, *See Weigel v. Maryland*, 950 F. Supp. 2d 811, 825–26 (D. Md. 2013), dismissal with prejudice is amply justified where, as here, the Court had alerted the plaintiff to the pleading deficiencies, allowed him to amend the pleading once, and yet the claims still fail. *See Glover v. Loan Science, LLC*, No. 8:19-01880-PWG, 2020 WL 3960623, at *3 (D. Md. July 13, 2020) (citing *Adams v. Sw. Va. Reg'l Jail Auth.*, 524 F. App'x 899, 900 (4th Cir. 2013)). In this circumstance, the Court surmises that the claims are "truly unamenable." *McLean v. United States*, 566 F.3d 391, 401 (4th Cir. 2009), abrogated on different grounds by *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721 (2020). Thus, the Court dismisses the Amended Complaint with prejudice.

## VI.     Conclusion

For the foregoing reasons, the Court grants the motion to dismiss at ECF No. 23 and dismisses the Amended Complaint with prejudice.

A separate Order follows.

03/30/2026
Date

/s/
PAULA XINIS
United States District Judge

17